Dunkin, Ch.
The object of the principal suit was to obtain instructions of the Court in carrying into effect the will of William Mathews, deceased, and to restrain the defendants, or some of them, from interfering with or obstructing the complainant in the discharge of his trust. The cross bill seeks, among other things, an account from the executor — prays that he may be removed, and that the Master may take charge of the estate; or rather, that he should be “directed to take an account of all the testator’s debts and legacies, and report a provisional division thereof; and that upon the complainants (in the cross bill) making such provision for the payment of that portion that shall be assigned to them, with consent of the creditors, they may be quieted in the possession of the lands and negroes and planting estates devised to them, subject only to be divested on failure to comply with their undertaking; and that the remaining portion of the debts and legacies be provisionally charged upon the portions of the estate devised to the other parties, subject to the final order of this Court.”
The testator died on the 22d July, 1848. A few days afterwards, the will was proved and the executor qualified; but, difficulties having soon arisen, the original bill was filed on the 6th December, 1848, and the cross bill, in January, .1849.
The first clause of the will is as follows, viz: — “ I direct that the whole of my estate shall be kept together, until, from the net produce of the crops, rents, and all other sources of income, all my debts, and the pecuniary legacies hereinafter bequeathed to the children of my deceased daughter, Mary Boyd, are fully paid and satisfied.”
By the next clause, the testator devised and bequeathed a portion of his real estate and slaves to his daughter,'Mrs. Hunt, and her children, in the manner therein specified; and, by the succeeding clause, a portion of his real estate and slaves, to his daughter, Mrs. Colburn, during her natural life, and, after her death, then to her daughter, Mary Ann Mathews Colburn, absolutely. After some other bequests, the residue of his estate is bequeathed to daughters, Susan B. Hunt and Ann A. Colburn, to be equally divided between them, subject, however, to the trusts and limitations declared in relation to the property specifically devised and bequeathed to them. William M. Lawton, Mary Ann Mathews Colburn and Charles Macbeth were appointed to execute the will, the first of whom alone qualified, Mary Ann Mathews Colburn being an infant of tender years, and Charles Macbeth having declined to act.
*5 The first question presented by the pleadings involves an inquiry into the powers and duties of the executor under this will. No interest is given to him, and he has no rights but such as are incident or necessary to the discharge of his trust. But the testator’s will is the law of his property, unless it violates some principle of policy — his will may determine the mode in which his debts shall be paid, and the line in which his estate shall pass — he may charge his devise with the payment of his debts, in exoneration of the personal estate, which would be otherwise primarily liable; or he may direct his lands to be sold by his executors for that purpose; or he may require a fund to be raised, with that view, from his real and personal estate. Neither of these is the mode which the law prescribes, but it is an indulgence which the law allows to a testator, and which those who partake his bounty are not permitted to gainsay.
The debts of the testator already ascertained, and the legacies to the children of Mrs. Boyd, amount to between fifty and sixty thousand dollars. The primary direction of the will is, that the whole of the testator’s estate shall be kept together until these charges shall be fully paid and satisfied from the net produce of the crops, rents, and all other sources of income.
The estate consisted, principally, of a plantation in Prince George, Winyaw, three plantations in St. James, Santee, a plantation and ferry in Christ Church, and some three hundred and fifty slaves, besides two houses in the City of Charleston. All this was subsequently devised and bequeathed, in equal or unequal, proportions, to his daughters and their families. The injunction seems as explicit as it is imperative, that this distribution shall not be carried into effect immediately, but that his whole estate shall be kept together, until, from the income, his debts and legacies shall be fully paid and satisfied. It is not questioned that it is the appropriate duty of the executor to ascertain and pay the debts, and to satisfy the legacies. The legal estate in the personalty vests in him by virtue of his appointment, and his assent to the bequests of these three hundred and fifty slaves, until after the debts were paid, would be a violation of his duty, and a manifest devastavit. But it is said, the law gives him no authority over the realty. In this country, even this proposition must be received with some qualifications. It cannot be questioned, however, that it is competent for the testator to vest in his executor the same power over his real estate that the law gives him in the personalty. The power to sell and convey his real estate, which is sometimes given to the executor, which is familiarly exercised, and which is recognized by the statute of 1712, includes every less authority. *6 The only inquiry is whether the intention of the testator has , been sufficiently expressed. It is not too much to say that a testator’s language must be construed in reference to the general understanding and usages of the country.
McC. C. R. 328.
Hill’s C. R. 59. St.eer’s Eq. R. 518.
The condition of real estate in this country has been somewhat changed, both by statutary regulation and custom. Lands are liable for all debts to the same extent as personal chattels, and may even be sold by the sheriff, under an execution against the executor. In Gregorie vs. Forrester, the Court, after adverting to these modifications of the English law, remarks (Nott, J.) “How far executors or administrators have the management of, or may exercise any control over the lands of their testator or intestate in this State, remains, as far as I am informed, still to be settled.” And again, “ From the nature of a part of the property of this estate, the executor must necessarily exercise some control over the real estate. Slaves cannot, in most instances, be well employed, except in the cultivation of the land, where the testator dies possessed of lands — they must, therefore, be employed under the superintendence of the executor — that would seem to impose upon him the necessity of employing overseers, paying taxes, receiving the profits, and generally superintending the whole economy of the plantation. But it gives no power to sell,” &c. I am not awáre that the soundness of these observations has ever been called in question; on the contrary, the control of the executor over the real estate, so far as it was necessary for the discharge of his trust, has been repeatedly recognized, as in Hagood v. Wells, and in Pell v. Ball, and in Walton v. Wooten.
In this state of the law, the testator directs all his estate to be kept together until from the income thereof his debts and legacies should be fully paid and satisfied. It must be kept together under the control of the executor, in order to enable him to discharge the trust which has been confided to him, of paying the debts and legacies out of the income of the estate. In the exercise of this control, as Judge Nott remarks, “ the necessity is imposed upon him of employing overseers, paying taxes, receiving the profits,” &c. But this power is conferred upon the executor by the testator, for the purpose of enabling him to realize the income as applicable to debts and legacies ; and this leads to the consideration of the manner in which the power of the executor has been exercised. As between the executor and those claiming under the will, that instrument is the rule. Creditors not interfering, it is the duty of all to carry out the intentions of the testator, so far as they can be understood. The testator was a planter of large means, and comparatively unencumbered estate. He owned several plantations, a ferry which had been very profitable, a house in Charleston, which he *7 rented out, besides a city residence which his family occupied during the whole or the greater part of the year. The sources, of his income were his crops of rice and cotton, his ferry and his rents. It was not suggested that he was in the habit of deriving income as such, from any other quarter, and it may well be inferred from this as well as from the language of the will, that the testator looked to those as the sources of income from which his debts and legacies were to be paid, and for which purpose his estate was to be kept together. The family of the testator, like the family of every other planter in his condition, were in the habit of deriving large supplies from his plantations, which interfered in no manner with, what is usually considered the income, and which would probably be otherwise lost to the proprietor. The estate was to be kept together until, from the income, the debts, &c., should be paid. It was to be kept together as he had kept it, and the income derived, as he had derived it. As between himself and those claiming under the will, it seems quite consistent with the duty of the executor and his present necessary control over the estate, that the objects of the testator’s affection and bounty should occupy the estates devised and bequeathed, so far as this may be done without diminishing the income, and without interfering with the temporary control which the testator has conferred upon his executor.
There is some embarrassment in the question relative to the Charlotte-street property. The testator, by the third disposing clause of his will, devises to his daughter Mrs. Colburn, during her natural life, “ my house and lot in Charlotte-street, where I now reside, and my house servants and furniture used in the said house.” It is submitted, on the part of the executor, that this house must be put to rent, the servants hired out, and the furniture sold, in order to derive an income, as provided by the first clause of the will. The other house in Charleston, which was rented out by the testator, was devised to Mrs. Hunt, and it is believed that no question was made that these rents were applicable to the payment of debts. I have remarked that it is entirely a question of intention ; and the Court may be aided by considering the situation of the testator, and of those to whom he was looking as the objects of his care or kindness. If the testator had left under his roof a widow and children, to whom he had devised the homestead, it would be difficult to affirm that it was the scheme of this will to remove his family from the premises, or put them to rent. This might become necessary to satisfy the rigorous demand of the creditor, but it could not be assumed as the voluntary arrangement or intention of the parent. But the testator left no widow. His wife had been dead four or five years, and he left no unmarried children. Mrs. Col- *8 bum had been married some fourteen years, she had but one child, a daughter, to whom the testator seems to have been tenderly attached, and whom, though a child, he named as an executrix of his will. I think it was stated, that Mr. and Mrs. Colburn had never resided elsewhere than with the testator. They certainly constituted a part of his family for many years prior to his death, and since the decease of testator’s wife in 1844, they alone resided with him. Some few years since, Mr. Colburn was unfortunate in business, and from that time had been entirely dependent on the testator. Although the language of the first clause is very general, I think there is enough in the terms of this devise to Mrs. Col-burn, taken in connection with her situation and relation to the testator, which warrants the conclusion that he did not intend this as a source of income for the payment of his debts. The devise includes not only the house in which the testator resided, and in which Mrs. Colburn and her family were living with him, but “ the house servants and furniture used in the said house.” The testator could not have been ignorant of Mr. Colburn’s inability to pay a proper rent for such an establishment, and the result must necessarily be that he and his family must quit the house. But to what purpose did he give his daughter a life estate m. furniture, and postpone the enjoyment until it would probably be destroyed or valueless ? I am of opinion that the testator did not intend that the family mansion should pass into other hands, nor that it should constitute a source of income for the payment of his debts. Drayton v. Grimke is somewhat analogous : The first clause of testator’s will was as follows: “ I will, order and direct, that my estate be kept together until myjust debts are fully paid and satisfied.” Notwithstanding the comprehensiveness of this provision, the Court held that certain specific devises and bequests were exempted from the operation of the general clause directing the estate to be kept together. Various reasons are assigned, arising as well from the terms of the will, as the situation of the property, and of the parties. Among other things, the Court say, “ The view is strengthened by the fact, that Vfilliam Henry Drayton, the first taker, had but a life estate, and as he had no other estate than this, and the mass of property intended for him constituted the fund for the payment of debts, it is most likely that the special provision in this clause was intended for his immediate use.” The application of these remarks to the provision of this will is sufficiently obvious, and leads to the conclusion already stated, that the house, house servants, and furniture used in it, were intended for the immediate possession and enjoyment of the devisee.
1 Hill C. R. 224.
The next clause is as follows: “ Item — I give and bequeath *9 to the children of my daughter, Susan B. Hunt, who may be living at the time of my death, to be equally divided between them — all bonds, notes, judgments, mortgages, or other securities, or evidences of debt, which I hold against their father Benjamin F. Hunt.”
The executor submits, whether the interest accruing on this debt, since the testator’s death, must be regarded as part of the income of his estate, which was to be kept together for the payment of his debts; and, if so, whether the interest should be calculated on the original principal, or on the aggregate amount due at his death.
It was stated, at the hearing, that painful differences had existed, at one time, between the testator and Col. Hunt, in relation to their pecuniary transactions. I think that a careful analysis of the language of this clause will well warrant the inference that the testator did not speak of an ascertained debt, or interest-bearing fund, as due by Col. Hunt, but that he referred to all the evidences of demands, adjusted or unadjusted, which the testator held, or which might be found in his possession; these he transferred to the children of his debtor, for as much as they were worth. It was thus rendered an account easy of adjustment; it was a peace offering which the Court would be solicitous to respect, and which any other construction might very easily convert into a fire-brand of litigation and discord. To effect the purposes of the testator, the gift should take effect immediately and entirely.
It seems that the testator, some time before the execution of his will, sold to his grandson, Benjamin F. Hunt, junr., a slave, named Diana. This slave was included in the marriage settlement of B. P. Colburn and wife, executed in February, 1834. The testator requires that the parties interested under the settlement should confirm the title in the slave to his vendee.
The testator purchased from Benjamin P. Colburn a plantation on Wambaw and twenty-three slaves, and, on the 25th August, 1847, B. P. Colburn conveyed the premises to the testator, in trust for the separate use of his wife during her natural life, and, afterwards, for the joint use of Benj. P. Colburn and the issue of the marriage during his life, and, after his decease, to the children of the marriage. In the event of Mrs. Colburn’s survivorship, without issue, the estate vested absolutely in her; and, in the event of his survivor-ship, under the same circumstances, he had a life estate in the whole, and a moiety vested absolutely in him, and the other moiety in the next of kin of his wife. The trusts of the marriage settlement are the same. The testator requires that the Wambaw property shall be held to the uses and *10 purposes of his will, and not to the uses declared in the deed 0f August, 1847.
l Swanst. 413.
All parties are willing to perfect the title of Benjamin F. jjunt; junr., in the slave Diana, but the surviving trustee under the marriage settlement, in whom is the legal estate, is not before the Court, and a reference must be directed as to the interests of the infant. In Gretton v. Howard it was held that an infant was bound to elect to take under, or against, a will, and a reference to the master was ordered, to inquire which was for his benefit.
So, in regard to the Wambaw plantation and slaves, B. P. Colburn expresses his readiness to release his contingent interest in such manner as the Court may direct. Mrs. Col-burn submits that she takes the same interest in possession under the deed and the will, and that as any other interest she may have is future and contingent, no case of election is presented. Her interests under the deed have been already stated. In the ninth clause of testator’s will, after reciting that B. P. Colburn had, in consideration of a debt released by the testator, conveyed the said plantation and slaves to him, to the trusts and purposes set forth in said deed; “ and whereas,” (continues the recital,) “ the said plantation and negroes were purchased and paid for by me; now I do direct, as a condition precedent to the bequests and devises by me herein made to my daughter, Ann A. Colburn, and my grand-daughter, Mary Anna M. Colburn, that the said plantation and negroes mentioned in the said deed, so far as shall be in the power of the parties interested therein, shall be held, not to the uses, trusts, and limitations declared in the said deed, but to the trusts and purposes declared in this my will of and concerning the property devised and bequeathed to my said daughter Ann and her child; and on failure of the parties interested complying with my will in this particular, I revoke and annul all of the devises and bequests made to them, and devise and bequeath the property, above devised and bequeathed to them, to my daughter Susan B. Hunt and her children, subject to the same trusts, and for the same estates, as the property herein devised and bequeathed to them is subject to.”
Clearly, this is the language of a man expressing his intention to dispose of property as his own, because he had purchased and paid for it, although he admitted the equitable interests to be in others. It is the assertion of a proprietor’s will, and acquiescence is secured by a strong sanction.
The Wambaw plantation' and twenty-three slaves are to be held, “ not to the uses, trusts, and limitations declared in the deed, but to the uses and purposes declared in the will concerning the property devised to his daughter,” &c. “ The *11 trusts and purposes,” to which that property was, by his will, devoted, was, in the first place, to the payment of his debts and legacies — then to his daughter. Mrs. Colburn, for life, “ and, after her death, then to her daughter, Mary Ann Matthews Colburn, her heirs, executors, administrators and assigns forever“ but, should the said Mary Ann Matthews Colburn die before she attains' the age of twenty-one years, or day of marriage, then I give the said property, so given to her, to the children of my daughter Susan, to be equally divided among them.”
It is obvious that the testator was not satisfied with the provisions of the deed of August, 1847; and the interest secured to Benjamin P. Colburn may have been, and probably was, the leading cause of discontent, but he seems not to have entirely approved the other limitations — at least, he liked better the scheme of his own will. In this view, as if he had the power under the deed to revoke the former uses and declare new ones, he annuls the uses, trusts, and limitations, and devotes the property, not merely to the limitations declared in his will, but to the purposes to which he had directed the property, devised and bequeathed to Mrs. Col-burn, to be applied. It is impossible always to avoid ambiguity, but when the testator changed the expression, he probably intended a different meaning. “ Purposes” was intended to indicate more than the “ limitations” of the estate, and pointed to the other objects to which the testator’s estate was appropriated. I think, therefore, thg,t Mrs. Colburn’s present interest under the deed is different from that which she takes under the will. But I am further of opinion that her contingent interest under the deed renders it a case of election. Mr. Justice Story, § 1095, adverts to the opinion which once existed, that the doctrine of election was inapplicable to persons claiming a remote interest in property. He says, “ it has been well remarked that the doctrine of election is applied to interests, not in respect of their amount, but of their inconsistency with the testator’s intention; and to assume their remoteness or their value as a criterion of the existence or absence of that intention, would introduce that uncertainty which, in questions of property, is perhaps the worst defect of the law.” He concludes by stating that “ the principle is now well established, that the doctrine of election is equally applicable to all interests, whether they are immediate or remote, vested or contingent, of value, or of no value; and as well in regard to real as to personal estate.” I think, therefore, that Mrs. Colburn must be put to her election. But, in regard to this property also, a reference must be directed as to the interests of the infant, Mary Ann M. Colburn.
l Hop. Leg. 331.
The question next to be considered, relates to the provision in favor of the children of Mrs. Boyd. The fifth clause of the will is as follows, viz: “ Item — I give to the four chil-¿ren 0f my deceased daughter, Mary Boyd, three thousand dollsrs, each, to be paid as hereinbefore directed, out of the income of my whole estate, and should either of the said children die before arriving at the age of twenty-one years and day of marriage, then I give the share of such child or children so dying, to be equally divided among the survivors of them; and if only one survives, then the whole of the sum of twelve thousand dollars to that one.”
Mrs. Boyd, the testator’s daughter, had had four children, but one of them, an infant of tender years, had died before the date of the testator’s will. The three surviving children (all of whom are under twenty-one years of age) resided, at the date of the will, and still reside with their father, the Rev. Charles LeRoy Boyd, in the State of Alabama. It is submitted, whether the three surviving children are to take three thousand dollars each, or to divide the sum of twelve thousand dollars among them.
Mr. Roper states the general rule to be, that “ where distinct legacies are given to individuals, or an aggregate fund is directed to be divided among them, nominatim, in equal shares, their interests are several; and, if any of them die before the testator, what was intended for those legatees will lapse into the residuum. But to this rule there are various exceptions, which he proceeds to consider and to illustrate by the authorities. “ A distinction must be noticed between cases where a legacy is given to a class of persons, in general terms, as tenants in common, as to the children of B. and those instances in wh'ch it appears upon the face of the will that particular objects, at the date of it, were intended to take the property. In the latter, the death of one of the legatees before the testator, will occasion a lapse, but it is not so in the other, since it is presumed that those persons of the described class who should survive the testator, were the only objects of his bounty.” I think the case may fall within this distinction. The legatees were the objects of the testator’s bounty, because they were the children of his deceased daughter, Mary Boyd ; and it is presumed, says Mr. Roper, that those persons of the described class, who should survive the testator, were the only objects of his bounty. The children are not designated by name in the will, nor is there any thing on the face of the instrument from which to infer that they were personally known to the testator. So in the first clause of the will, these legatees have no other description than as “ the children of my deceased daughter, Mary Boyd.” The attempt to enumerate them, and to fix their *13 proportions, is, in ilself, of little importance. “It often happens, (says Mr. Jarman,) that a gift to children describes them as consisting of a specified number, which is less than the number found to exist at the date of the will. In such cases, it is highly probable that the testator has mistaken the actual number of the children, and that the real intention is, that all the children, whatever may be their number, shall -be included.” And so e converso, in Lord Lesley v. Lord Lake, a trust to five daughters of testator’s neice, E. was held to apply to a daughter of E. (and who was the only daughter at the 'date of the will.) There is enough on the face of this instrument to justify the inference, that the testator intended a legacy of twelve thousand dollars to the children of his deceased daughter, Mary Boyd; and his mistake in the number of the children, and, consequently, in their proportions of the bequest, ought not to be permitted to defeat the intention. “But,” says Mr. Roper, “ another exception to the rule of lapsing in consequence of one of the legatees dying before the testator, occurs when there is a limitation over of the legacy to the survivors generally, or upon the death of any of them under the age of twenty-one. In such instances, it is settled that the limitation to survivors shall have effect during the continuance of the testator’s life; so that, in the first case, if a legatee tenant in common die before the testator, or if, in the end, the legatee die in the -testator’s lifetime before attaining twenty-one, or the happening of the event upon which the limitation over is made to depend, the legacy will not lapse, but go to the survivors under the express provision of the will. Among other cases cited, is Ledsome v. Hickman, where testator gave £300 apiece to A, B and C, at twenty-one or marriage, and if any died before, then to the survivor. B died in the testator’s lifetime. It was held that the £300 did not lapse, but went over to A and C. The principle is founded on the presumed intention of the testator to give the aggregate sum to those individuals, and the limitation to survivors warrants this presumption, although the previous language had created a tenancy in common, and had fixed the proportions.” In this case, the testator gives to the four children of his daughter, ■Mary Boyd, three thousand dollars.each, “and should either •of the said children die before arriving at the age of twenty-one years and day of marriage, then I give the share of such child or children so dying, to be equally divided among the survivors of them; and if only one survive, then the whole of the sum of twelve thousand dollars to that one.” If Mrs. Boyd’s four children had been alive at the date of the testator’s will, but one had died before the testator, the case would be concluded by Ledsome v. Hickman, and on much stronger *14 evidence of intention. Does it make any difference in (this view, that the child was dead before the date of the testator’s will ? Ordinarily, the will, as to the personalty, speaks at the death of the testator. But in order to ascertain the intention, evidence is admitted as to the existing state of things at the making of his will, but to explain the ambiguity, in this case, it is necessary to go further back.
1 Beavan, 151.
2 Vernon 611.
1 Rop. Leg. 189; Pearson v. Pearson, 1 Sch. & Lefe. 10 Gillow v. Turnbull, 1 McC. C.R. 148.
Having thus ascertained the origin of the testator’s mistake, the inquiry recurs, whether the limitation of twelve thousand dollars “ to the surviving child,” does not demonstrate the intention of the testator, that this sum should be paid to the surviving children or child of Mary Boyd, if there were any such to demand it. Such seems to me his obvious PurP0SeJ which it is difficult to express in more explicit terms. With respect to interest, nothing is perceived to withdraw this from the principle that general legacies bear intemst one year horn the death of the testator, whether payable out of income or otherwise, or whether the fund from which are to be be or not.
The testator had married Mary Barksdale. The will of her father, George Barksdale, bears date 2d December, 1793, and was proved 14th March, 1794. By one of the clauses he gives to his “ daughter, Mary Barksdale, during her life, the use of a negro woman, Charlotte, with her increase, and at her decease, to her children lawfully begotten of her body, to them, their heirs and assigns forever.” After several intermediate bequests to his other daughters, as well as to Mary, the testator declares as follows, viz : “ the remaining part of all my personal estate, I do give and bequeath unto all my children, viz: Mary Barksdale, my son Thomas Jones Barks-dale, my daughter Elizabeth Barksdale, my son George Barksdale, and my daughter Abigail Barksdale, in the following manner, that is to say — I do give the use of my daughters’ proportion or parts of my personal estate to them, with the increase of the negroes they shall have during their lives, and at their decease, to their children lawfully begotten of their bodies, and they to receive their shares or parts, at the day of marriage, or at the age of twenty-one years, and my son, Thomas Jones Barksdale, and my son, George Barks-dale, to receive their proportion undivided, until my youngest daughter arrives at the age of twenty-one years, or marries.”
Mrs. Mathews, the wife of the testator, died on the 30th, November, 1843. Charles L. Boyd, the husband of Mary Boyd, on behalf of himself and his children, insists that the testator received in his lifetime, aud had at the time of his death, slaves and other personal property, which his wife held under her father’s will, and which, on her decease, de *15 volved, by the limitations of the will, on her children living at her death, and the representatives of such as were then dead. Mr. and Mrs. Colburn also insist that they are enti-tied to a moiety of .these slaves, which they allege to be sixty-two in number, on the ground, that by the true construction of the will of George Barksdale, the limitation is to such of the children of Mary Barksdale as were living at the time of her death.
Lemacks v. Glover,1 Rich. Eq. R. 141.
2 Jarman -wins, 74-75” 3 Dow. 61.
It is stated in some part of the pleadings, that Mrs. Mathews had seven children, four of whom diéd in infancy. Mrs. Boyd also died in thé lifetime of her mother, leaving Mrs. Hunt and Mrs. Colburn the only surviving children. No evidence was adduced on this subject, and it will necessarily form matter of inquiry, but these facts are assumed as sufficiently accurate to warrant the judgment of the Court.
• No question was made at the hearing, that the interest of Mrs. Mathews, under her father’s will, was a life estate, and that the limitation over was valid; the will must be taken together, and the express restriction of her interest, in Charlotte, to the use during her natural life, with remainder to her children lawfully begotten of her body, “ to them, their heirs and assigns forever,” and the subsequent bequest of the use of the proportion of his daughters of his personal estate during their lives, and “at their decease, to their children lawfully begotten,” manifest at once, and very clearly, the intention of the testator to give the usufruct to his daughters, and to create a new stock in their children. “Butthequestion which has been chiefly agitated,” says Mr. Jarman, “ in bequests to children, is as to the point of time at which the class is to be ascertained, or in other words, as to the period within which the objects must be born and existent.”
In enumerating the rules of construction which have been established, regulating the class of objects entitled in respect of periods of birth under general gifts to children, the second is as follows: “ Where a particular estate or interest is carved out, with a gift over to the children of the person taking that interest, such gift will embrace not only the objects living at the death of the testator, but all who may subsequently come into existence before the period of distribution. Thus, in a bequest to A. for life, and after his decease to his children, the children of A., (if any,) living at the death of the testator, together with those who happen to be born during the life of A., the tenant for life, are entitled.” Among the authorities cited is Odell v. Crone, in which Lord Eldon says: “The principle of the law is this, that where persons are to take, under this general description, the object of the Court should be, to comprehend as many as, by fair construction, could fall within it; and unless it was necessary, under the words, to *16 shut out all except such as were bom at the time of the testator>s ¿ea(h. the rule is, to include all such as may have come into existence before the time when the fund is to be distribu-Mr. Jarman afterwards explains that, by objects at the period of distribution, is not meant children existing at that time, “for,” says he, “it has been already shown, that all who have existed in the interval between the death of the testator and the period of distribution, whether living or dead at the latter period, are objects of the gift, and may, therefore, not improperly, be termed objects at that period; their decease before the period of distribution having no other effect than to substitute their respective representatives, supposing, of course, their interest to be transmissible.” The principle is recognized and explained in Nayle v. Witherell; and by our own Courts, in Rutledge v. Rutledge, all the children of Mrs. Mathews, as they came in esse, took vested, transmissible interests. The shares of those who died in infancy passed to the father and the. then living brothers and sisters, in the manner provided by the statute, as no administration could be deemed necessary. But I think there must be administration on Mrs. Boyd’s estate, and leave is granted so to amend the pleadings.
4 Lim. 114 Dudi. Eq. R. 241 •
Story’s Eq. §. 1493. '
Story, §.1085. 2 Ves. Jr. 544.
There was no proof that the testator had received any property which his wife took under the will of her father; much less was there any proof that he had undertaken, by his will, to dispose of such property as his own. But the cause was argued on the assumption that the slaves, which had been received from the estate of George Barksdale, were among those “usually used, attached and belonging to” the several plantations described in the will, which plantations he had devised to his daughters, “and all the slaves, &c., and every other thing usually used, attached and belonging to said plantations” respectively.
This leads to the inquiry,' whether a case of election is not presented. It is immaterial in this inquiry whether, in disposing of this property, the testator did. so knowing it not to be his own, or whether he did so under the erroneous suppo-sidon that it was his. own. Either is sufficient to raise a case of election. The principle of election is, that he who accepts a benefit under a deed or will, must adopt the whole instrument, so far as to renounce every right inconsistent with it. The modern doctrine is, that a legatee, claiming against the will, does not thereby forfeit the whole benefit proposed for him, but only so much as is necessary to compensate ihe legatee, whose claims he has disappointed. In Lady Cavan v. Pulteney, Lord Rosslyn refers, with approbation, to the judgment of Chief Justice De Grey, expressed on the hearing of a former branch of the case before the Lord Chancellor, Chief *17 Justice De Grey, and Baron Eyre. He had held that election was not a case of express condition; it is no forfeiture of interest; but the Court, lays hold of what is devised, and makes compensation out of that to the disappointed party. “It had been argued on that occasion,” continues Lord Ross-lyn, “that the devise, being on no express condition, it could not be implied; then, that Mrs. Pulteney could not be put to her election, because she had no alternative; being a married woman, it was contended she could not defeat her husband’s right.” In answer to that, Chief Justice De Grey distinguished the equity of this Court from an express condition, “ which,” he says, “ must be performed as framed; and, if it is not, that will induce a forfeiture — but the equity of this Court is,” (as he very well expresses it,) “to sequester the devised interest quousque, till satisfaction is made to the disappointed devisee.” Then in respect to her supposed disability to do that which, in case of submitting to the will, she must do, he says, “her being a femme couverte has no effect. The election is her’s and her husband’s; a married woman may forfeit a conditional gift; the estate is in her; he takes in her right. If they disagree, it must be considered by the Court what is most for her interest.” Mr. Baron Eyre said, “the husband’s interest is only an emanation from the wife’s estate.”
2 Ves.jr. 697.
Much of this is applicable to the claim of Benjamin P. Col-burn and wife, who insist that they are entitled to a moiety of the sixty-two negroes, which are said to be held under George Barksdale’s will. The marriage contract of February, 1834, contains a covenant to settle any after-acquired property of the wife, and in this Court would estop him from insisting on his marital rights; nor does he interpose any such exclusive claim, but “ submits to the Court that he and his wife are entitled to one-half of the said negroes, in right of his said wife.” If, then," the assertion of this right is inconsistent with the claim of her co-legatee, under the will of her father, I think her interests under the latter instrument must be sequestered, until compensation has been made to the disappointed legatee. In Wilson v. Lord John Townsend, it is said that, when the Court directs an election to be made, “ if the party is under restraint, and cannot accomplish that, it is the misfortune of the party; but the consequence is, that while he continues in that situation, his claim must be barred; for it is directly contrary to the intention and distribution of the property — that is, in point of law, implied. As to this bequest to Mrs. Wilson, for her separate use, the Court cannot execute a will by parcels; it must be totally, or with regard to the party by whose means it fails; the Court can do nothing for that party; the Court must execute the will.”
*18 I have arrived at a different conclusion in respect to the c]ajm 0f the husband of Mrs. Boyd. His wife died before life-tenant — supposing an administration to have been ma¿6j he would be entitled to one-third of his deceased wife’s interest, under the will of her maternal grandfather. Mr. Boyd is not a beneficiary under the will of Mr. Mathews; nor does he claim under any one who has a benefit from that will. He cannot, therefore, be required to conform to the provisions of that instrument, by renouncing a right inconsistent with it.
The case of the children of Mrs. Boyd is more perplexing, rather in consequence of an expression in some of the books, than from any reason that I can perceive. It is stated, by Mr. Jarman, that the doctrine of election does not apply to derivative claims — and, in the case put, that may very well be: — “A legatee is not precluded from claiming derivatively, through another, property which such other person has taken, in opposition to the will.” A daughter, having taken a legacy to her separate use, under her father’s will, is not thereby precluded, on a subsequent day, from claiming her dower in land which her husband held in opposition to the will. This is the extent of the qualification. But, says Mr. Jarman, (and he is fully sirstamed by the authorities,) “ the doctrine of election clearly applies as well to reversionary and remote, as to immediate interests.” At the death of the testator the children of Mrs. Boyd had an immediate interest under his will in the legacy of twelve thousand dollars, but they had, at the same time, an interest (not quite so immediate and well ascertained) in other property which the testator had Undertaken to give to other persons. Is it of any consequence in what way, or by what title, or through what source, they acquired this latter interest, or whether it was legal or equitable ? If Mrs. Boyd had been alive at the death of the testator, and had renounced a legacy given her by the will, in order that she might hold the property acquired from George Barksdale, and had afterwards died, leaving these children her distributees, it would be analogous to the case stated by Mr. Jarman. An election had been already made, and the penalty of holding the property in opposition to the will had been exacted, long before these children had acquired any interest whatever in the Barksdale negroes. But that is not the case before the Court; and I think it must be referred to the Master to inquire which alternative would be for the interest of the children of Mrs. Boyd. Something was said about the Statute of Limitations; but it seems quite clear that the statute cannot run until there is a legal representative of Mrs. B.oyd.
It would seem premature to make any observations in re *19 gard to the rights of Col. Hunt, as growing out of the limitations in George Barksdale’s will, until his plea to the original bill has been disposed of, he not being a party to the cross-bill. His plea is, for want of any specific charge or demand against him, and for want of equity, as well as for want of privity between the executor (complainant) and himself.' The conflicting claim under George Barksdale’s will, which is set forth in the bill, would be a sufficient reason for making Col. Hunt a party, although it is not stated in the bill that either he or Mr. Colburn, or any other persons than Mr. Boyd and his children, have interposed any claim under that will. It is proper that Col. Hunt should have an opportunity of being heard by his answer, before the Court pronounces any decree involving his rights.
But the correspondence, which was introduced in evidence, evinces, in very unambiguous terms, the views which the devisees have taken of the executor’s rights and of their own. The letter of February, 1849, is a distinct notice to the executor that “ any attempt, on his part, to plant the plantations, Pleasant Meadow or Springfield, except with the consent, and in subordination to the devisee, acting by her male friends, would be resisted, and the executor and his agent expelled” —that “any further attempt, on the part of the executor, to interfere with the real estate, would be met with direct opposition, and that the executor and his agents would be treated as trespassers.”
In the view which the Court has taken, the executor was authorized, under the provisions of the will, to plant the land with the negroes, in order to raise crops for the payment of the debts and legacies. Any interference with the executor, in the lawful discharge of this duty, would entitle him to the aid of this Court, against the devisee and the agents of the devisee. In this respect, therefore, the Court cannot say that Col. Hunt was an improper party under the prayer of the bill.
It is ordered and decreed, That the cross-bill be dismissed.
It is further ordered and decreed, That leave be granted to amend the original proceedings, by making parties thereto the surviving trustee, under the marriage settlement of Benjamin P. Colburn and wife. That it be referred to one of the Masters of this Court to take an account of the debts, legacies and assets of the testator, William Mathews, deceased; and also of the complainant’s administration of the same, with leave to report any special matter. That he further inquire and report whether it would be for the interest of the infant, Mary Ann Mathews Colburn, to conform to the provisions of the testator’s will.
It is further ordered and decreed, That the Master inquire *20 whether any, and what part, of the property held by the testator, was subject to the provisions of George Barksdale’s will; and whether any, and what part of the same, was specifically or otherwise disposed of by the testator, William Mathews, and to whom. And that he take an account of the said property since the death of the life-tenant — -with liberty, also, to the Master to report any special matter in relation to this subject of inquiry; and that he also inquire and report whether it would be for the interest of the children of Mrs. Boyd to conform to the will of the testator, by renouncing any claim ■they may have on the Barksdale property which is inconsistent with said will.
Each party to be at liberty to apply at the foot of this decree for such further or other order as may be necessary to carry into effect the provisions of the same.
The various grounds of appeal taken by the several parties are sufficiently noticed in the following decree of the Court of Appeals:
Dunkin, Ch.
The several grounds of appeal in this case were submitted without argument, except on the appeal taken by the executor. The Court has considered the grounds taken by the children of Charles Le Roy Boyd, and those taken by Mrs. Colburn. Without the aid which the argument of counsel might afford, the Court is unable to perceive any error in the adjudication of the Circuit Court, and the same is affirmed.
The Chancellor held that the Charlotte Street house, house servants and furniture used in it, were intended for the immediate possession and enjoyment of the devisee. This Court has examined the will, and is entirely satisfied with the decree.
The remaining grounds of appeal taken by the executor and devisees may be disposed of by a few general observations. The devisees, or some of them, insist that the executor, having no legal “interest in the lands, he has no right to enter, hold and plant the real estate of the testator, against the consent of the devisee.” On the other hand, the executor has appealed, because the Chancellor did not declare that the executor was entitled to the exclusive possession and control of the real estate until the debts and legacies were fully paid, and because he held the devisees entitled to plantation supplies while the debts and legacies were unpaid. The executor has also appealed from a subsequent decretal order of the Chancellor, directing an inquiry into certain facts, and the effects of them, instead of forthwith ordering an attachment for contempt and injunction, as moved by the executor. The executor also appeals, because the Chancellor refused leave to file certain letters and additional affidavits. The subject *21 of these latter interlocutory orders was purely ministerial, and was addressed to the discretion of the Chancellor; and this Court is of opinion that' the discretion was properly exercised.
The first clause of the testator’s will directs the whole of his estate to be kept together, until, from the net produce of his crops, rents, and all other sources of income, his debts and legacies were paid. A few months after the testator’s death some of the devisees resisted the executor’s control of the real estate.
The Court ruled that, by the laws and usages of this country, the executor was entitled to the control and possession of the real estate, so far as it was necessary to enable him to carry into effect the will of the testator, hy making crops, collecting rents, and deriving income, as the testator had himself done, and that “any interference with the executor, in this lawful discharge of his duty, would entitle him to the aid of this Court, against the devisees and the agents of the devi-sees.” The Chancellor further held that, “as between the executor, and those claiming under the will as volunteers, it seemed quite consistent with the duty of the executor, and his present necessary control over the estate, that the objects of the testator’s affection and bounty should occupy the estates devised and bequeathed, so far as this might he done without diminishing the income, and without interfering with the temporary control which the testator has conferred upon the executor.” For the purpose of disposing of this appeal, the Court deems it necessary only to say that they perceive no ground for revising the judgment of the Chancellor.
But subsequent to the decree of the Chancellor, to wit, in May, 1849, an order was obtained, at the instance of the executor, directing the Master to call in the creditors of the estate, and to inquire and report whether it was practicable to pay the debts and legacies from income, &c., and whether any and what portion of the estate should be sold for the payment of the debts. The creditors were, by the same order, enjoined from prosecuting their rights at law. The Master has submitted a report, which was referred to in argument, but which is not before us. It seems that the debts and legacies amount to about seventy thousand dollars, and the income to six or seven thousand dollars. It is therefore manifest that a sale of a portion of the estate is indispensable, unless the debts are discharged by the devisees.
All parties concur that the testator’s project of paying his debts and legacies from the income must be abandoned as impracticable. In discussing the course proper to he adopted by the Court, much was said about the necessity of protecting and preserving the rights of the executor. It seems neces- *22 gary only to say that both the testator and this Court regard the executor as merely a trustee for preserving and securing the rights of those interested under the will. In the discharge of these fiduciary duties he will be maintained by the Court, and the law has fixed the compensation to be allowed for the performance of such duties. But the Court looks first to the interest of those for whom the executor is trustee, to wit, the creditors, and then the legatees, &c. The testator devised and bequeathed his entire estate, real and personal, on various trusts and limitations. He contemplated no sale of the corpus by the executor, and he authorized none. If the creditors were permitted to proceed at law, they have the right to levy on any part of their debtor’s estate, without regard to the provisions of his will. This would necessarily provoke proceedings in this Court, requiring payment to be made by the devisees and legatees, on the well established principles of this Court. To anticipate and prevent this multiplicity of suits, and variety of litigation, the decretal order of May 1849 was granted. The authority of the Court to grant such order, and the practice under it, is considered and affirmed by Chancellor Kent, in Thompson v. Brown. The Court, restraining the creditors at law, is bound to provide a fund for their payment. By the provisions of the testator’s will, his real and personal estate are inseparably connected in the several devises and bequests. A sale has become indispensable. But the executor has no legal estate in the realty, and he has no authority to dispose of the personalty. A sale by the authority of this Court would alone confer a good title on the purchaser. This Court has already directed the debts to be established before the Master. The sales should therefore be made by the Master, and the fund disbursed by him, under the direction of the Court. To carry into effect these principles, the following decretal order has been adopted by the Court — to wit:
4 John. C. R. 638.
It is declared that the debts of the testator are to be borne by his devisees, Mrs. Hunt and Mrs. Colburn, in equal proportions ; the intention of the testator to equalize their shares being sufficiently apparent on the face of the will. And it is further declared that the waiter Harry is a part of the house servants bequeathed to Mrs. Colburn, and that the washerwoman Myra is a part of the negroes belonging to Snee farm, bequeathed to Mrs. Hunt. As to the disputed point, whether the carpenters, Bén, Hector, Maurice, Paul, Little Ben, and John, and the sloop hands and boatmen, Nat, Jim, Phil, Joe, Steward and Jack, are part of the negroes devised to Mrs. Colburn, or of the residuary estate, the same is referred back to the Master, to take further testimony. As to the extent and quantity of land devised to Mrs. Colburn, under the de *23 vise of Tibwin, the same is also referred back to the Master for further information, and it is ordered that a survey and ( plat of all the lands claimed as belonging to Tibwin be made, for the information of the Court. That the sloop, travelling' horses and pony, the gold watch and spectacles, are a part of the -residuary estate. That the creditors who have proved their claims before Mr. Laurens, under the decree of Chancellor Dunkin,-and against whose claims no-exceptions are filed, have a right to immediate payment by a sale, and that the legatees have a right to be paid out of the income, with ■interest from one year after the decease of the testator. That it is necessary that a sum sufficient to pay off the debts and legacies-be raised by a sale, under the order of this Court, to prevent injustice and inequality by the arbitrary sale of property of either devisee under execution, and to protect the legatees and tenants for life from the indefinite postponement of the benefits intended for them by the testator. That the plantation and negroes called Thompson’s are to be considered part of Mrs. Colburn’s portion under the will, and liable to contribution for debts, equally with the rest — and that the money owing for the purchase of said property is to be considered the -proper debt of testator, so far as the creditors are concerned. But.it is referred to the Master to ascertain and report whether, as between Mrs. Hunt and Mrs. Colburn, said debt is chargeable specifically upon said land and negroes, or upon testator’s whole estate. And as it is represented to the Court that Mrs. Colburn desires her contributory part of the debts and legacies to be raised by an immediate salé, and that Mrs. Hunt desires time to make arrangements with the creditors for her part: It is ordered and decreed, that all the residue of the estate, not specifically devised, be sold by the Master of this Court, and the money, and any balance in the hands of the executor, applied to the satisfaction of testator’s debts. That the Master proceed forthwith to raise, by a sale of real or personal estate devised and bequeathed to Mrs. Col-burn, to be selected, if she thinks fit, by her, such a sum as, with what she has already contributed, will be equal to her portion of the amount that may remain due for the testator’s debts and legacies, after such application of the residuary estate, and that the money so raised be applied towards the payment of her part of the debts and legacies; and so much as may remain of the estate, real and personal, -so devised and bequeathed to Mrs. Colburn, be delivered to her, to have and to hold the same to her sole and separate use during her natural life, and to her daughter, Mary Ann Mathews Col-burn, after her decease, according to the terms of the will, freed and discharged from any interference on the part of any of the parties to this suit, other than creditors of the testator. *24 And it is further ordered that Mrs. Hunt and her children (have time till the first day of March ensuing to make arrangements for paying oif her proportion of the debts and legacies aforesaid, and have leave to substitute, in place of any of the creditors or legatees who may be paid oif, such person or persons as may advance the money for paying oif such creditors or legatees, to the extent of the sums so advanced and actually applied. And-the real and personal estate devised and bequeathed to Mrs. Hunt and children shall stand as a security in their hands for the moneys so advanced, in the same manner as the same was liable in the hands of the testator or his executor to the original demand. But no person so substituted to the rights of the testator’s creditors or legatees shall have any lien, claim, or demand whatsoever, on the real or personal estate devised or bequeathed to Mrs. Colburn. And in case the creditors be not fully paid and satisfied by the said first day of March, then the Master shall raise, by a sale of the real and personal estate devised and bequeathed to Mrs. Hunt, to be selected, if she thinks fit, by her, a sum sufficient to pay oif the residue of the testator’s debts and legacies aforesaid; and that upon payment, on the part of Mrs. Hunt, of her proportion of the said debts and legacies, the real and personal estate devised and bequeathed to her, or so much thereof as may remain, be delivered to her, to have and to hold the same to her sole and separate use during her natural life, and to her children after her decease, according to the terms of the testator’s will, freed and discharged from any of the parties to this suit. And in case any of the claims against which exceptions have been filed shall be ultimately established against the estate, the same shall be satisfied in the same manner as the other debts of the testator are by this decree provided for; and the Master of this Court in such case shall proceed to raise the amount out of the estates devised to the testator’s daughters and their families, in equal proportions, by sale, as hereinbefore directed. And it is fur-. ther ordered that, upon the executor’s (Mr. Lawton) accounting for the money in his hands, and .complying with this decree, he be forever exonerated and discharged of and from all other and further claims and demands of. all and singular the devisees, legatees and creditors of the testator who are parties to this suit. And it is further ordered that all sales, made in pursuance of this decree, be on the following terms, that is to say: Real Estate, half cash, residue in one and two years. Negroes, half cash, half in twelve months, to be secured in all instances by bond and mortgage and personal security.
And it is ordered that the costs of this suit be paid out of the estate.
*25 And as to the right of the Rev. Charles Le Roy Boyd, it is further ordered that the amount of his claim be considered a charge upon the estate, and paid as other debts.
Caldwell and Dargan, CO., concurred.
JohNston, C., absent at the hearing.

Decree affirmed.